# Exhibit A

## COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, ss.

SUPERIOR COURT
DOCKET NO:
2283CV00354

| | |
|---|---|
| STEVEN ROACH, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| VICTORY AUTOMOTIVE GROUP, | ) |
| INC. AND CAPPO MANAGEMENT | ) |
| XLVII, LLC | ) |
| Defendant. | ) |
| | ) |

## **AMENDED COMPLAINT AND JURY DEMAND**

### **Parties**

1.      Plaintiff Steven Roach ("Mr. Roach" or "Plaintiff") is a male resident of the

Commonwealth of Massachusetts, residing at 560 Bedford Street, Unit A7, Abington, MA

02351.  Abington is in Plymouth County.

2.      Defendant Victory Automotive Group, Inc. ("Victory") is a foreign for-profit

corporation that is incorporated in the state of Michigan.  Its principal office is located at 46352

Michigan Avenue, Suite 200, Canton, MI 48188.

3.      Defendant Cappo Management XLVII, LLC ("Cappo") (Victory and Cappo

collectively "Defendants" or the "Company") is a foreign for-profit corporation that is

incorporated in the state of Michigan.  Its principal office is located at 46352 Michigan Avenue,

Suite 200, Canton, MI 48188.

**Jurisdiction and Venue**

4.      The Superior Court of Plymouth County has subject matter jurisdiction over this matter because Plaintiff alleges that there are more than $25,000 in damages associated with the claims and/or because Defendants conduct business in Massachusetts, including operating a car dealership in Weymouth, MA.

5.      This court has personal jurisdiction over Victory because Victory engaged in and transacted business in the Commonwealth of Massachusetts, including by employing the Plaintiff in Massachusetts, and the Plaintiff's causes of action stem largely from the Victory's business transactions within the Commonwealth of Massachusetts.  Indeed, the Plaintiff was employed by Victory in the Commonwealth of Massachusetts (at 211 Main St., Weymouth, MA 02188), was managed and reprimanded by Victory in the Commonwealth of Massachusetts, and was terminated by Victory in the Commonwealth of Massachusetts.

6.      This court has personal jurisdiction over Cappo because Cappo engaged in and transacted business in the Commonwealth of Massachusetts, including by employing the Plaintiff in Massachusetts (at 211 Main St., Weymouth, MA 02188), and the Plaintiff's causes of action stem largely from the Cappo's business transactions within the Commonwealth of Massachusetts.  Indeed, the Plaintiff was employed by Cappo in the Commonwealth of Massachusetts, was managed and reprimanded by Cappo in the Commonwealth of Massachusetts, and was terminated by Cappo in the Commonwealth of Massachusetts

7.      Venue is appropriate in Plymouth County, because Plaintiff is a resident of Plymouth County.

**Statement of Facts**

8.      Mr. Roach was born in 1974 and is an African American man with dark

(black) skin color.

9.      Mr. Roach's skin color is darker than that of most Caucasians, as well as that of some other African American individuals.

10.      On or around June 5, 2017, Mr. Roach was hired by the Company (including each of Cappo and Victory), doing business as Ocean Honda of Weymouth, as a sales associate employed by the Company at a Company car dealership located at 211 Main St., Weymouth, MA 02188.

11.      Cappo and Victory (both collectively and each individually) exercised control over the day-to-day aspects of Mr. Roach's job.

12.      For example, employees of both entities (Cappo and Victory) had supervisory capacities over Mr. Roach and/or had the ability to (and did) direct, discipline, and provide work assignments to Mr. Roach.

13.      Indeed, while Mr. Roach's direct managers were employed by Cappo, Mr. Roach's upper-level managers (including Human Resources) were employed by Victory.

14.      These upper level managers oversaw all employees of both Cappo and Victory.

15.      Further, both Victory and Cappo had common ownership.

16.      Additionally, both Cappo and Victory played a role in determining Mr. Roach's rate of pay, maintaining his personnel file, and/or making hiring/firing decisions related to Mr. Roach.

17.      In fact, while Mr. Roach was paid by Cappo, he had a Victory email address and most (and potentially all) policies and procedures at the Company (such as the employee handbook) were provided and controlled by Victory.

18.      As such, Mr. Roach was jointly employed by both Cappo and Victory.

19.    At all relevant times, the Company (including each of Cappo and Victory collectively and individually) employed 15 or more employees for 20 or more calendar weeks during the preceding 12 months.

20.    At all relevant times, Mr. Roach was a qualified employee, and his job performance was satisfactory.

21.    Indeed, among similarly situated individuals in his position, Mr. Roach had the highest revenue-related performance numbers for the 2019 sales year, as well as the highest customer satisfaction rating of the dealership for the year of 2021.

22.    After Mr. Roach started working for the Company, he noticed with significant alarm that his co-workers frequently used offensive racial slurs in the workplace, including the term "nigger."

23.    Mr. Roach found his co-workers' harassing conduct, which was often undertaken in the presence of management, extremely offensive and harassing.

24.    On or around November of 2017, after months of hearing harassing language used in the workspace, Mr. Roach raised protected concerns to his direct supervisor, General Sales Manager, Mike Sewall ("Sewall").

25.    Sewall is a Caucasian man and his skin color is significantly lighter than that of Mr. Roach.

26.    Sewall responded to Mr. Roach's concerns in a dismissive manner, including by telling Mr. Roach to handle it himself and to tell his co-workers to cut it out if the racially-related harassment bothered him.

27.    Mr. Roach tried speaking with his co-workers and asked them to stop their harassing conduct, including to stop using the N-word towards him and in front of clients.

28.     However, due to Sewall's failure to take any action to address Mr. Roach's protected concerns, Mr. Roach's Caucasian co- workers continued to harass Mr. Roach and other non-white individuals, including by continuing to refer to Mr. Roach and other black employees as "niggers."

29.     In continuing these comments, Mr. Roach was subjected to a pattern or practice of discrimination that constituted a continuing violation and wrong that went through the time of Mr. Roach's termination.

30.     Additionally, the Company's Finance Manager, Sandra Minelli ("Minelli") discriminated against Mr. Roach and his non-Caucasian customers.

31.     Minelli is a Caucasian woman.

32.     For example, as the Finance Manager it was Minelli's responsibility to process Mr. Roach's sales to all customers. However, if Mr. Roach's customer was not Caucasian, Minelli would avoid speaking directly with them, requiring Mr. Roach to relay all the relevant financial information to the client.

33.     Indeed, Minelli would purposefully skip over, and delay processing Mr. Roach's customer's purchases (particularly when those customers were themselves non-white) and would instead prioritize processing the customer purchases handled by Mr. Roach's non-African American co-workers.

34.     Minelli's refusal to process Mr. Roach's customer's purchases in a timely manner frequently resulted in sales by Mr. Roach taking far longer to complete. Indeed, sales by Mr. Roach that would typically take an hour (if conducted by other non-African American employees), would sometimes take up to five hours to complete. Sometimes these significant discriminatory delays caused sales to fall through (or otherwise impeded Mr. Roach from making

other sales).

35.     To compensate for Minelli's poor treatment of his customers of color, Mr. Roach often had to provide the customers with free automobile accessories (such as weather mats) to maintain a positive sales relationship and to prevent the sale from falling through while these customers were forced to wait for overly long periods of time for approval.  Mr. Roach used his own personal funds to purchase these items.

36.     Minelli's conduct was also part of the Company's broader culture of mistreating non-white (and especially African American) employees and customers.

37.     These actions directly reduced Mr. Roach's income, which was largely commission-based.

38.     Because of the discriminatory delaying of the processing of Mr. Roach's customer's purchases, Mr. Roach was only able to make two sales per-day on average, instead of the four or more Mr. Roach had the potential to make without these delays.

39.     Mr. Roach raised protected concerns to General Sales Manager Sewall regarding Minelli's racially biased behavior, but Sewall refused to do anything about it and seemed annoyed that Mr. Roach was raising such protected discrimination concerns.

40.     Further, during this time (from June 2017 until approximately July 2020), Mr. Roach was paid entirely on a commission basis and did not earn time and a half pay for hours worked over 40 hours a week (despite not belonging to any overtime exemptions under Massachusetts law).

41.     Notably, during this entire time period, Mr. Roach worked, on average, at least 60 to 65 hours each week.

42.     From 2017 through May of 2020, Mr. Roach was regularly

subjected to harassing and discriminatory words and actions by his co-workers, including continued use of racial slurs at work.

43.     Mr. Roach is currently 47 years old, and was over 40 years old at all times during his employment with the Company.

44.     The Company appeared to prioritize the hiring of younger individuals, and accordingly its workforce, especially its sales-focused workforce, skewed younger than the demographic population in Massachusetts.  Indeed, the significant majority of other employees in positions similar to Mr. Roach were significantly younger than Mr. Roach.

45.     Upon information and belief, the Company had not known Mr. Roach's age at the time he was given a job offer, and only later learned his age.

46.     Notably, throughout Mr. Roach's employment at the Company, there was a clear difference in the way management treated younger employees compared to older employees such as Mr. Roach.

47.     For example, if Mr. Roach arrived to work one minute late, Sewall would reprimand him for this and say he would not tolerate people being late.

48.     This was odd because younger and non-African American co-workers regularly arrived late (much more frequently than Mr. Roach did) and Sewall did not reprimand them.

49.     Periodically, Mr. Roach talked to older employees at the Company and found there was agreement that the Company favored younger employees compared to older employees.

50.     Mr. Roach sometimes spoke to his coworker Valer Topalli ("Topalli"), who was approximately the same age as Mr. Roach (and hence, along with Mr. Roach, was one of the oldest employees in

such a sales position at the Company's Weymouth facility), about these discrimination concerns.

51.     Around early July of 2020, Topalli called the owner of the Company, Jeffery Cappo ("Mr. Cappo"), to raise his and Mr. Roach's collective concerns about the apparent bias against older employees of the dealership.

52.     Upon information and belief, Topalli made clear to Mr. Cappo that Mr. Roach had disclosed to him (Topalli) that Mr. Roach shared these concerns about age discrimination.

53.     In response, Mr. Cappo scheduled a meeting for Topalli, David Sandhu ("Sandhu"), another sales associate, and Mr. Roach, with the Executive Manager, Lou DeFranco ("DeFranco").

54.     On or around July 25, 2020, Sales Associates Topalli, Sandhu, and Mr. Roach participated in the scheduled meeting with DeFranco to discuss their concerns regarding the bias against older employees at the Company. Sewall also attended this meeting.

55.     During this meeting, Mr. Roach raised concerns about the discrimination the older employees at the Company were being subjected to.

56.     DeFranco is a Caucasian man who is approximately thirty years old (and hence significantly younger than Mr. Roach).

57.     During this meeting Sewall stated, "We don't need experienced people," as a response to Mr. Roach's concerns that his younger co-workers were given preferential treatment. While saying this, Sewall clearly appeared upset and angry and Mr. Roach and Topalli for raising these protected concerns.

58.     This comment clearly indicated that the Company was indeed biased against older employees.

59.     After this meeting, Sewall suddenly changed the classification of most of Mr.

Roach's clients to "in-active" in the Company's business software. This was clearly done to harass and retaliate against Mr. Roach for raising protected concerns.

60.     Clients with an "in-active" status do not generate notifications or reminders to follow up with them after a specific period, which makes it more difficult and time consuming for a sales associate such as Mr. Roach to generate sales, and inevitably undermines performance.

61.     After Sewall marked most of Mr. Roach's clients as "in-active" for clearly retaliatory reasons, Mr. Roach noticed that Sewall began to distribute responsibility for Mr. Roach's existing clients to Mr. Roach's younger co-workers.

62.     This reduced Mr. Roach's compensation and also made Mr. Roach's performance look worse, even though this was caused by Sewall's actions.

63.     This was clearly done in retaliation for the protected discrimination concerns Mr. Roach had raised in his meeting with DeFranco a short time previously.

64.     Mr. Roach approached Sewall and asked him why Sewall was giving his (Mr. Roach's) clients to younger, non-African American co-workers.

65.     During this conversation, Mr. Roach made clear he believed this was due to his age, race, color, and/or because he had raised protected concerns (including shortly before his clients were reassigned).

66.     Additionally, during this time, despite Mr. Roach's previous expressions of protected harassment concerns, racial slurs continued to be used in the workplace.

67.     This daily exposure to harassing racist language left Mr. Roach feeling that the Company considered him less human, and less deserving of respect, than his Caucasian co-workers.

68.     Mr. Roach raised protected concerns to Sewall multiple times, indeed often multiple times each month, regarding the use of racially harassing language in the workplace, such as the word "nigger."

69.     Sewall did nothing to address Mr. Roach's concerns.

70.     Eventually a customer complained about the use of the N-word at the dealership.

71.     After the customer complained, Sewall spoke with the sales team about refraining from using the word "nigger" in the workplace since it might hurt business.

72.     In response, Mr. Roach's non-African American co-workers began instead using the term "jigaboo" as a substitute for the term "nigger."

73.     Notably, "jigaboo" is still an offensive racial slur directed at African Americans. Indeed, the origin of the word "jigaboo" is a reference to an African word that means "meek" or "servile."

74.     Furthermore, by calling African American employees and customers "jigaboos," it was clear that Mr. Roach's co-workers were purposefully substituting the word "jigaboo" in place of where they had previously routinely used the word "nigger," as a way to signal the N-word without explicitly articulating it.

75.     As such, Mr. Roach was offended by his co-workers' continued use of racial slurs to refer to black and/or African Americans individuals.

76.     Although racist bias appeared to be particularly strong against African American individuals, the racism of Company employees and management was often directed at other non-white individuals of a variety of races.

77.     On Tuesday, July 27, 2021, Mr. Roach was assisting an Asian customer who wanted to purchase a vehicle.

78.      As the Finance Manager, it was Minelli's responsibility to verify the customer's automobile loan for the purchase, and to complete the paperwork for the sale.

79.      After Mr. Roach notified Minelli of his customer's intent to purchase the vehicle, she told Mr. Roach she was going to "skip over" Mr. Roach's customer to process the sales of other customers (who were Caucasian and/or were being assisted by Caucasian sales employees).

80.      Mr. Roach asked Minelli what he should tell his customer who had been in the dealership for over an hour and a half at this point.

81.      Minelli responded by saying, "tell him I don't like Asians."

82.      Taken aback by her statement Mr. Roach asked Minelli what she meant, and she repeated, "tell him I don't like Asians."

83.      Shocked by Minelli's blatantly discriminatory statement, Mr. Roach walked away.

84.      Mr. Roach was frustrated and upset with Minelli's continued overtly racist behavior.

85.      Mr. Roach then spoke to Sewall that same day (July 27, 2021), and in this conversation he reiterated his concerns about Minelli's discriminatory behavior directed toward non-Caucasian employees and customers, including himself and his customers.

86.      Mr. Roach went on to say that he intended to lodge a complaint with Human Resources and DeFranco about the continual racism he and his customers were being subjected to.

87.      Upon information and belief, Sewall conveyed to others in management that

Mr. Roach had expressed protected concerns about racism and intended to file a

discrimination complaint with Human Resources.

88.     Approximately two days later, on or around Thursday, July 29, 2021, Mr. Roach

went into work for his scheduled shift.

89.     Approximately, ten minutes before the end of Mr. Roach's shift that night,

Sewall asked Mr. Roach to speak with him in his office.

90.     Mr. Roach went into Sewall's office where Sewall and Paul McCarthy

("McCarthy"), the Sales Manager, were sitting.

91.     McCarthy is younger than Mr. Roach.

92.     Sewall told Mr. Roach he was being fired and handed him a notice of

termination letter.

93.     This letter stated that Mr. Roach was terminated for allegedly using obscene

language to a manager (Minelli).

94.     Importantly, Sewall and McCarthy never asked Mr. Roach if he had used obscene

language and never even told Mr. Roach what "obscene language" he had allegedly used.

Indeed, there was clearly no meaningful investigation conducted.

95.     Notably Mr. Roach had not used obscene language, but even if Mr. Roach had

(which he had not), there were many younger and non-African American employees of the

Company who used offensive and obscene language all the time and were not reprimanded or

terminated for this.

96.     Indeed, the use of obscene and vulgar language was commonplace among

younger and non-African American employees at the Company, including in front of managers,

and these employees were not disciplined or terminated for using such language.

97.    Furthermore, the Company had a policy and practice of utilizing progressive discipline.

98.    The Company failed to follow its own progressive discipline processes by summarily terminating Mr. Roach for one alleged instance of misconduct.

99.    In contrast, upon information and belief, younger and/or non-African American employees accused of similar or more severe misconduct were routinely given multiple steps of progressive discipline before facing potential termination.

100.    The Company also failed to conduct a meaningful investigation into the alleged misconduct, thus further proving its intent to utilize this allegation as a pretext to fire Mr. Roach for discriminatory and/or retaliatory reasons.

101.    Thus, Mr. Roach was clearly singled out for harsher treatment based on his age and/or race, as well as because he had raised protected concerns.

102.    As such, Mr. Roach was involuntarily terminated on Thursday, July 29, 2021.

103.    On September 23, 2021, Mr. Roach filed a complaint with the Massachusetts Attorney General's Office ("MA AG") for non-payment of wages/failure to pay overtime.

104.    On October 1, 2021, Mr. Roach received a private right of action from the MA AG's office to pursue his wage claims.

105.    On or around November 10, 2021, Mr. Roach timely filed a charge of discrimination with the Massachusetts Commission Against Discrimination ("MCAD"), which was cross filed with the United States Equal Employment Opportunity Commission ("EEOC").

106.    On or around March 3, 2022, Mr. Roach notified the MCAD of his intention to proceed in Court.

107.    On March 11, 2022, the EEOC provided Mr. Roach with a Right to Sue letter.

108.    This lawsuit is timely filed.

## COUNT I
### (Race and Color Discrimination in Violation of M.G.L. c 151B)
### Plaintiff v. All Defendants

109.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

110.    Defendants (including both Cappo and Victory individually and collectively) is an employer under M.G.L. c. 151B because it and they employ six or more persons.

111.    Mr. Roach is an African American man with dark skin color.

112.    Defendants, including, but not limited to, its and their agents, harassed and discriminated against Mr. Roach with respect to his compensation, terms, conditions or privileges of employment, because of Mr. Roach's race (black/African American) and color (dark skinned).

113.    More specifically, Defendants subjected Mr. Roach to a pattern of racial discrimination while he was employed by the Defendants, including by subjecting Mr. Roach to a hostile work environment (in which racial slurs such as "nigger" and "jigaboo" were repeatedly used), discriminatory acts which reduced his performance metrics and compensation, and other differential (and less favorable) treatment.

114.    Mr. Roach was further subjected to adverse actions, including, but not limited to, a hostile and harassing work environment, being criticized more harshly, being subjected to discriminatory less favorable treatment, and the termination of his employment, in a discriminatory manner because of his race and/or color.

115.    Upon information and belief, Mr. Roach was replaced by a non-black and/or non-African American individual with lighter skin color than his own.

116.    The Defendants' actions were wanton, malicious, and/or oppressive.  The Defendants acted with malice and/or with reckless indifference to the state protected rights of Mr. Roach.

117.    As a direct and proximate result of the Defendants' violations of M.G.L. c. 151B, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

118.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, emotional distress damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, interest, and costs.

**COUNT II**
**(Race and Color Discrimination in Violation of Title VII, 42 U.S.C. §§2000e, et seq.)**
**Plaintiff v. All Defendants**

119.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

120.    During all relevant periods, the Defendants (both Cappo and Victory individually and collectively) was an employer under Title VII, 42 U.S.C. §§2000e et seq. (hereinafter, "Title VII") because it and they are persons engaged in an industry affecting commerce and it and they had fifteen or more employees for each working day in each of 20 or more calendar weeks during the relevant calendar years.

121.    Defendants, including, but not limited to, its and their agents, harassed and discriminated against Mr. Roach with respect to his compensation, terms, conditions or privileges of employment, because of Mr. Roach's race (black/African American) and color (dark skinned).

122.    More specifically, Defendants subjected Mr. Roach to a pattern of racial discrimination while he was employed by the Defendants, including by subjecting Mr. Roach to a hostile work environment (in which racial slurs such as "nigger" and "jigaboo" were repeatedly used), discriminatory acts which reduced his performance metrics and compensation, and other differential (and less favorable) treatment.

123.    Mr. Roach was further subjected to adverse actions, including, but not limited to, a hostile and harassing work environment, being criticized more harshly, being subjected to discriminatory less favorable treatment, and the termination of his employment in a discriminatory manner because of his race and/or color.

124.    Upon information and belief, Mr. Roach was replaced by a non-black and/or African American individual.

125.    Defendants acted with malice and/or with reckless indifference to the federally protected rights of Mr. Roach.

126.    As a direct and proximate result of the Defendants' actions, Mr. Roach has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

127.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay),

diminished earning capacity, injury to reputation, other monetary damages, compensatory

damages (including, but not limited to, future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses),

punitive damages, attorneys' fees, and costs.

## COUNT III
### (Race and Color Discrimination in Violation of 42 U.S.C. §1981, et seq.)
### Plaintiff v. All Defendants

128.    The Plaintiff herein incorporates all paragraphs above and below as if set forth

fully herein.

129.    During all relevant period, the Defendants (both Cappo and Victory individually

and collectively) were employers under the meaning of 42 U.S.C. § 1981, et seq. (hereinafter,

"Section 1981") because it and they employed one or more persons.

130.    The Defendants harassed and discriminated against Mr. Roach with respect to his

compensation, terms, conditions, or privileges of employment, because of Mr. Roach's race

(African American) and/or color (black).

131.    More specifically, Defendants subjected Mr. Roach to a pattern of racial and color

discrimination while he was employed by the Defendants, including by subjecting Mr. Roach to

a hostile work environment (in which racial/ethnic slurs such as "nigger" and "jigaboo" were

repeatedly used), discriminatory acts which reduced his performance metrics and compensation,

and other differential (and less favorable) treatment.

132.    Mr. Roach was further subjected to adverse actions, including, but not limited to,

a hostile and harassing work environment, being criticized more harshly, being subjected to

discriminatory less favorable treatment, and the termination of his employment in a

discriminatory manner because of his race and/or ethnicity.

133. Upon information and belief, Mr. Roach was replaced by a non-black and/or African American individual.

134. As a direct and proximate result of the Defendants' violations of Section 1981, Mr. Roach has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

135. The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses), damages for emotional distress (including, but not limited to, damages for emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages, attorneys' fees, interest, and cost.

### COUNT IV
### (Age Discrimination in Violation of M.G.L.c 151B)
### Plaintiff v. All Defendants

136. The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

137. Defendants (both Cappo and Victory individually and collectively) are employers under the definition of M.G.L.c 151B because they employed six or more persons.

138. Mr. Roach was born in 1974 and was over 40 at all times during his employment.

139. The Defendants, including, but not limited to, its and their agents, harassed and discriminated against the Plaintiff with respect to his compensation, terms, conditions, or privileges of employment, because of the Plaintiff's age.

140.     More specifically, by way of illustration, the Company subjected the Plaintiff to differential (and less favorable) treatment.  Indeed, the work force at the Company was significantly younger than Mr. Roach and it was clear that the Company favored the hiring of young employees.

141.     Mr. Roach was further subjected to adverse actions, including, but not limited to, a hostile and harassing work environment, being criticized more harshly, being subjected to discriminatory less favorable treatment, and the termination of his employment in a discriminatory manner because of his age.

142.     Upon information and belief, Plaintiff was replaced in his position by a younger employee.

143.     The Defendants, including through its agents and employees, committed discriminatory acts in a willful, wanton, and/or malicious manner.

144.     The Defendants' acts were committed with knowledge or reason to know that the acts were in violation of the rights of the Plaintiff.

145.     As a direct and proximate result of the Defendants' violations of Massachusetts state law, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

146.     The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss

of enjoyment of life, and other nonpecuniary losses, double damages, treble damages, punitive

damages, attorneys' fees, interest, and costs.

## COUNT V
### (Age Discrimination in Violation of the ADEA)
### Plaintiff v. All Defendants

147.    The Plaintiff incorporates all paragraphs above and below as if set forth fully

herein.

148.    Defendants (both Cappo and Victory individually and collectively) is an employer

under the definition of the ADEA because it and they employed 20 or more employees for 20 or

more weeks in the preceding calendar year.

149.    Mr. Roach was born in 1974 and is currently 47 years old.

150.    The Defendants, including, but not limited to, its and their agents, harassed and

discriminated against the Plaintiff with respect to his compensation, terms, conditions, or

privileges of employment, because of the Plaintiff's age.  Indeed, the work force at the Company

was significantly younger than Mr. Roach and it was clear that the Company favored the hiring

of young employees

151.    More specifically, by way of illustration, the Company subjected the Plaintiff to

differential (and less favorable) treatment.

152.     Mr. Roach was further subjected to adverse actions, including, but not limited to,

a hostile and harassing work environment, being criticized more harshly, being subjected to

discriminatory less favorable treatment, and the termination of his employment in a

discriminatory manner because of his age.

153.    Upon information and belief, Plaintiff was replaced in his position by a younger

employee.

154.     The Company acted with malice and/or with reckless indifference to the protected rights of the Plaintiff.

155.     The Company's acts were committed with knowledge or reason to know that the acts were in violation of the rights of the Plaintiff.

156.     As a direct and proximate result of the Company's violations of federal law, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, other monetary harms, pain and suffering, loss of enjoyment of life, and emotional damages.

157.     The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, liquidated (i.e. double damages), punitive damages, attorneys' fees, interest, and costs

**Count VI**
**(Retaliation in Violation of M.G.L. c. 151B)**
**Plaintiff v. All Defendants**

158.     The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

159.     The Plaintiff engaged in protected activity under M.G.L. c. 151B, including, but not limited to, (i) opposing, voicing protected concerns, and/or engaging in other protected activity regarding an illegal hostile and harassing work environment related to his race, age, and/or color; (ii) opposing, voicing protected concerns, and/or engaging in other protected activity related to the discriminatory actions taken by the Company due to Mr. Roach's race, age, and/or color; and (iii) opposing, voicing protected concerns, and/or engaging in other protected

activity related to the discriminatory treatment of non-white customers (including Asian customers).

160.    The Company retaliated against Mr. Roach for engaging in protected activity, including, but not limited to, the aforementioned protected activity, by subjecting Mr. Roach to adverse actions, including, but not limited to, a hostile and harassing work environment, being criticized more harshly, being subjected to discriminatory less favorable treatment, and the termination of his employment in a retaliatory manner.

161.    More specifically, the Defendants subjected the Plaintiff to a pattern of harassment and retaliation for engaging in protected activities under M.G.L. c. 151B, including, but not limited to, by subjecting Mr. Roach to a hostile work environment (in which racial/ethnic slurs such as "nigger" and "jigaboo" were repeatedly used), discriminatory acts which reduced his performance metrics and compensation, and other differential (and less favorable) treatment, in a retaliatory manner.

162.    Defendants acted with malice and/or with reckless indifference to the state protected rights of Mr. Roach.

163.    Defendants acted with willful and/or knowing indifference to the state protected rights of the Plaintiff.

164.    As a direct and proximate result of Defendants' violations of M.G.L. c. 151B, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

165.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay),

diminished earning capacity, injury to reputation, other monetary damages, emotional distress

damages (including, but not limited to, future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses),

punitive damages, attorneys' fees, and costs.

**COUNT VII**
**(Retaliation in Violation of Title VII, 42 U.S.C. §§2000e, et seq.)**
**Plaintiff v. All Defendants**

166.    The Plaintiff incorporates all paragraphs above and below as if set forth fully

herein.

167.    The Plaintiff engaged in protected activity under Title VII, including, but not

limited to, (i) opposing, voicing protected concerns, and/or engaging in other protected activity

regarding an illegal hostile and harassing work environment related to his race and/or color; (ii)

opposing, voicing protected concerns, and/or engaging in other protected activity related to the

discriminatory actions taken by the Company due to Mr. Roach's race and/or color; and (iii)

opposing, voicing protected concerns, and/or engaging in other protected activity related to the

discriminatory treatment of non-white customers (including Asian customers).

168.    The Company retaliated against Mr. Roach for engaging in protected activity,

including, but not limited to, the aforementioned protected activity, by subjecting Mr. Roach to

adverse actions, including, but not limited to, a hostile and harassing work environment, being

criticized more harshly, and the termination of his employment in a discriminatory manner.

169.    More specifically, the Defendants subjected the Plaintiff to a pattern of

harassment and retaliation by individuals employed by the Defendants in retaliation for engaging

in protected activities under Title VII, including, but not limited to, including by subjecting Mr.

Roach to a hostile work environment (in which racial/ethnic slurs such as "nigger" and "jigaboo"

were repeatedly used), discriminatory acts which reduced his performance metrics and compensation, and other differential (and less favorable) treatment, in a retaliatory manner.

170.    The Company acted with malice and/or with reckless indifference to the federally protected rights of the Plaintiff.

171.    Defendants acted with willful and/or knowing indifference to the federally protected rights of the Plaintiff.

172.    As a direct and proximate result of the Defendants' violations of Title VII, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

173.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to, lost compensation and benefits (including, but not limited to, back pay and front pay), diminished earning capacity, injury to reputation, other monetary damages, compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses), punitive damages, attorneys' fees, and costs.

**COUNT VIII**
**(Retaliation in Violation of 42 U.S.C. § 1981, et seq.)**
**Plaintiff v. All Defendants**

174.    The Plaintiff herein incorporates all paragraphs above and below as if set forth fully herein.

175.    Mr. Roach engaged in protected activity under Section 1981, including, but not limited to, opposing and raising protected concerns regarding harassing behavior and/or disparate treatment by the Company and its employees regarding African American, black, and/or non-white employees and customers (including himself and others) in violation of Section 1981.

176.     Mr. Roach further engaged in protected activity under Section 1981, including, but not limited to, by voicing protected concerns regarding the harassing and discriminatory actions improperly undertaken by the Defendants, and Defendants' employees and agents, based on the race and color of Mr. Roach himself, other employees, and customers, and/or the creation of a hostile work environment through illegal harassment and discrimination related to the race and/or color of Mr. Roach himself and other employees and customers.

177.     Defendants retaliated against Mr. Roach for engaging in protected activity, including, but not limited to, the aforementioned protected activity, by subjecting Mr. Roach to adverse actions, including, but not limited to, a hostile and harassing work environment, being criticized more harshly, being subjected to discriminatory less favorable treatment, and the termination of his employment in a discriminatory manner.

178.     More specifically, the Defendants subjected the Plaintiff to a pattern of harassment and retaliation by individuals employed by the Defendants in retaliation for engaging in protected activities under Section 1981, including, but not limited to, subjecting the Plaintiff to a hostile and harassing work environment, criticizing the Plaintiff more harshly, subjecting the Plaintiff to discriminatory less favorable treatment, and the termination of Plaintiff's employment, in a retaliatory manner.

179.     Defendants acted with malice, an evil motive, recklessness, and/or callous indifference to a federally protected right.

180.     As a direct and proximate result of the Defendants' violations of Section 1981, the Plaintiff has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

181.    The Plaintiff seeks all damages to which he is entitled, including, but not limited

to, lost compensation and benefits (including, but not limited to, back pay and front pay),

diminished earning capacity, injury to reputation, other monetary damages, compensatory

damages (including, but not limited to, future pecuniary losses and other nonpecuniary losses),

damages for emotional distress (including, but not limited to, damages for emotional pain,

suffering, inconvenience, mental anguish, and loss of enjoyment of life), punitive damages,

attorneys' fees, interest, and costs.

**COUNT IX**
**(Retaliation in Violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et**
**seq.)**
**Plaintiff v. All Defendants**

182.    The Plaintiff incorporates all Paragraphs above and below as if set forth fully

herein.

183.    The Plaintiff engaged in protected activity under the ADEA, including, opposing,

voicing protected concerns, and/or engaging in other protected activity related to age

discrimination.

184.    Defendants retaliated against the Plaintiff for engaging in protected activity,

including, but not limited to, the aforementioned protected activity, by subjecting Mr. Roach to

adverse actions, including, but not limited to, a hostile and harassing work environment, being

criticized more harshly, being subjected to discriminatory less favorable treatment, and the

termination of his employment, in a retaliatory manner.

185.    More specifically, the Defendants subjected the Plaintiff to a pattern of

harassment and retaliation by individuals employed by the Defendants in retaliation for engaging

in protected activities under the ADEA, including, but not limited to, subjecting the Plaintiff to a

hostile and harassing work environment, criticizing the Plaintiff more harshly, subjecting the

Plaintiff to discriminatory less favorable treatment, and the termination of Plaintiff's employment, in a retaliatory manner.

186.    Defendants unlawfully coerced, intimidated, threatened, and/or interfered with the Plaintiff's exercising of, or enjoyment of, one or more rights granted by the ADEA.

187.    Defendants acted with willful and/or knowing indifference to the federally protected rights of the Plaintiff.

188.    As a direct and proximate result of Defendants' violations of the ADEA, Mr. Roach has suffered and continues to suffer damages, including, but not limited to, lost compensation and benefits, reduced earning capacity, pain and suffering, loss of enjoyment of life, and emotional damages.

189.    The Plaintiff seeks all damages to which he is entitled, including, but not limited to compensatory damages (including, but not limited to, emotional distress damages, reduced earning capacity, and lost compensation and benefits, including back pay and front pay), liquidated (i.e. double) damages, interest, attorneys' fees, and costs.

**COUNT X**
**(Failure to Pay Overtime Wages in Violation of M.G.L. c. 151)**
**Mr. Roach v. Defendants**

190.    The Plaintiff incorporates all paragraphs above and below as if set forth fully herein.

191.    The Company is an employer under the Massachusetts Wage Act, M.G.L. c. 151 (hereinafter, "MWA") and Mr. Roach is an employee of the Company under the MWA.

192.    Ms. Roach routinely worked more than 40 hours per week and thus was deprived of overtime pay from when he started in 2017 through sometime in July 2020.

193.    Notably, during this entire time period, Mr. Roach worked, on average, at least 60 to 65 hours each week

194.    Defendants knowingly and willfully failed to pay Mr. Roach time and a half pay (i.e. overtime pay) for all hours worked in excess of 40 hours per week.

195.    As a direct and proximate result of Defendants' violations of the MWA, Mr. Roach has suffered and continues to suffer damages, including, but not limited to, lost wages, interest on lost wages, attorneys' fees, and costs.

196.    Mr. Roach seek all damages to which he is entitled, including, but not limited to, lost wages, treble damages in the amount of three times the amount of the lost wages for a knowing and willful violation of the MWA, interest on the lost wages and the treble damages on this interest, attorneys' fees, and costs.

WHEREFORE, the Plaintiff, Steven Roach, respectfully requests that this honorable court:

A. Schedule this matter for trial by jury;

B. Find the Defendant liable on all counts;

C. Award the Plaintiff lost compensation and benefits (including, but not limited to, back pay and front pay);

D. Award the Plaintiff compensatory damages (including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses);

E. Award the Plaintiff damages for emotional distress and suffering;

F. Award the Plaintiff damages for other harms, including, but not limited to, reduced earning capacity, injury to reputation, and other monetary damages;

G.  Award the Plaintiff liquidated damages;

H.  Award the Plaintiff punitive damages;

I.  Award the Plaintiff double and/or treble damages on his lost wages and benefits caused by his termination and other discriminatory and retaliatory acts;

J.  Award the Plaintiff his unpaid wages (including unpaid overtime) and treble damages on these unpaid wages;

K.  Award the Plaintiff his attorney's fees;

L.  Award the Plaintiff interest and costs;

M.  Award the Plaintiff all other damages to which he is entitled; and

N.  Grant such further relief as is just and equitable.

Respectfully Submitted,

STEVEN ROACH

By his attorneys,

THE LAW OFFICES OF WYATT & ASSOCIATES P.L.L.C

Date: June 8, 2022              By:     */s/Timothy Brock*

Timothy Brock, 695971
TBrock@wyattlegalservices.com

Benjamin J. Wyatt, 664182
BWyatt@wyattlegalservices.com

The Law Offices of Wyatt & Associates, P.L.L.C.
17 Elm Street, Suite C211
Keene, NH 03431
Telephone: (603) 357-1112
Facsimile: (603) 685-2868